**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| TERRIE L. FRYREAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-3148 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Terrie L. Fryrear appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income Disability benefits (SSI) under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416(i), 423 1381a, and 1382c (collectively Disability Benefits). This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Fryrear has filed a Brief in Support of Motion for Summary Judgment (d/e 17) (Fryrear Brief), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 20).  The parties have consented to proceed before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order</u>

entered July 25, 2018 (d/e 8).  For the reasons set forth below, the

Decision of the Commissioner is AFFIRMED.

<u>STATEMENT OF FACTS</u>

Fryrear filed her applications for Disability Benefits in June 2010.  She

alleged that she became disabled on May 1, 2005.  An Administrative Law

Judge (ALJ) held a hearing on September 20, 2012.  On December 14,

2012, the ALJ denied Fryrear's application.  This Court reversed and

remanded that decision.  <u>Fryrear v. Commissioner of Social Security Case</u>

<u>No. 14-3083 (Fryrear I) d/e 18</u>, <u>Opinion entered February 23, 2016 (Fryrear</u>

<u>I Opinion)</u>, a copy of which is included in the record, <u>Certified Transcript of</u>

<u>Proceedings Before the Social Security Administration (d/e 12 and 13) (R.)</u>,

R. 866-910.

This Court remanded the matter because the ALJ misread the 2007

sleep latency test.  The test supported Fryrear's claim that she had

narcolepsy, but the ALJ erroneously misread the test result and found

Fryrear's daytime sleepiness not to be severe.  <u>Fryrear I Opinion</u>, at 35-36,

R. 900-01.  The error also potentially affected other aspects of the decision.

<u>Id.</u> at 36-40, R. 901-04.  The evidence submitted prior to the remand,

including the testimony at the September 20, 2012 hearing, and the

evidence submitted to the Appeals Council after the ALJ's 2012 opinion,

are set forth in detail in <u>Fryrear I Opinion</u>, at 2-26,33-34, R. 867-91, 898-99.
The Court will not summarize that evidence again in detail.

The facts presented from the evidence produced after remand shows
the following.

Fryrear was born on March 17, 1984. She completed high school
and attended some college courses. She previously worked as a shipping
clerk, cashier in a fast food restaurant, and as an aide for older and
disabled persons. She suffered from remote history of bilateral carpal
tunnel syndrome with bilateral release surgery, Chiari malformation with
history of surgery; narcolepsy; and Ehlers-Danlos syndrome by report. She
last worked in January 2004. R. 36, 38, 59, 204, 684, 692-94, 796.

On January 8, 2013, Fryrear saw her primary care physician Dr.
Donna White, M.D. R. 1167. Dr. White commented on Fryrear's condition
in her treatment notes:

> She . . . has a new bottle [of eye drops] that she was trying to
> open when I walked into the room and was not able to open
> because of her lack of dexterity with her hands which all goes
> back to some type of rheumatologic or autoimmune disease
> that we have not ever been able to put a finger on. She has
> recovered from her exacerbation of whatever it is she has with
> the Prednisone but continues to have ongoing fatigue, myalgias
> and arthralgias. Is having increasing fine motor difficulty with
> her hands which makes it difficulty (sic) for her to do things.
> Gets frustrated because she is trying to get Disability which I
> actually think is very appropriate for her to be getting given her
> underlying autoimmune rheumatologic issue. It has resulted in

her inability to sit or stand for any prolonged time. She lacks
fine motor control to do a lot of writing or typing. She lacks the
strength and control to do fine movements with her hands
because of her arthralgias and myalgias.  She is not able to do
repetitive squatting, bending, lifting, pushing or pulling.  She
deals with the fatigue on a constant day to day basis.  Pretty
much making herself get out of bed to do stuff as she refuses to
put herself into that sick role. . . .  Review of systems positive
for the fatigue, myalgias, arthralgias, difficulty gripping,
hypersomnolence to the point where she will fall asleep even
just standing at the bus stop waiting for the bus to pick her kids
up for school.  She has been tested in the past and was felt to
possibly be narcoleptic.  She is on treatment and it certainly
helps but it does not totally resolve her symptoms in any way,
shape, or form.

R. 1167.  Dr. White refilled her prescriptions.  R. 1168.

On October 22, 2013, Fryrear saw neurologist Dr. Douglas N.

Sullivant, M.D.  R. 1201-05.  Fryrear reported muscle weakness and

numbness in her legs and hands for the past 10 to 12 years.  She stated

that in February 2010, half her body stopped working for six months.  She

reported that the weakness was getting worse.  She also reported

neuropathy in her legs.  She said she had trouble walking up steps.  She

wore compression stockings all the time while she was awake. The

stockings substantially improved her leg pain.  She indicated that she got

no relief from her carpal tunnel release surgery.  She still drops things and

her hands were cold constantly.  She still had trouble with buttons and

picking up paper.  She reported that she exercised for half an hour each

day on a stationary exercise bicycle. She started this exercise regime a few months before this office visit. R. 1201.

On examination, Fryrear had 5/5 strength bilaterally throughout with normal muscle bulk and tone. Fryrear's sensory examination showed diminished pinprick sensation below the knees in both lower extremities and up to the elbows in both upper extremities. The sensory examination was otherwise normal. Fryrear did not need an assistive device to walk. Dr. Sullivant stated that Fryrear's sensory examination was "confusing." Dr. Sullivant recommended more testing and an expanded workup to exclude small fiber neuropathy. Dr. Sullivant recommended tricyclic agents and to continue regular aerobic exercise. Dr. Sullivant concluded that Fryrear was "not regarded as classic for Charcot-Marie-Tooth disease." R. 1204.[1] Dr. Sullivant said that the "persistent nature of her sensory complaints however are concerning." R. 1205.

On March 31, 2015, Fryrear saw nurse practitioner Donna Gail in Dr. White's office. Fryrear was complaining of headaches. R. 1169-73. She said she could not sleep at night. She said she could not lay her head down on a pillow. She said that Dr. White gave her injections in her head

---

[1] Dr. White defined Charcot-Marie-Tooth disease in her notes from the July 14, 2015 office visit discussed below. See R. 1256.

in the past that really helped.  R. 1169.  On examination, Fryrear's cranial nerves were intact, she had no speech difficulties, and she had normal gait with equal movement of all extremities.  Nurse practitioner Gail administered trigger point injections and renewed Fryrear's prescriptions.  R. 1171.

On June 18, 2015, Fryrear saw Dr. Sullivant.  R. 1188-94.  Fryrear reported that treatment of her thyroid condition resulted in significant improvement of her symptoms of weakness and pain.  R. 1188.  She reported that she was engaging in aerobic exercising five or more days a week and also engaging in flexibility exercising.  R. 1190.  On examination, Fryrear had no sensory deficits and could ambulate independently.  Dr. Sullivant made no diagnosis during this examination.  R. 1192.  Dr. Sullivant appended his prior finding that Fryrear's presentation was not classic Charcot-Marie-Tooth disease.  R. 1193.

On July 14, 2015, Fryrear saw Dr. White for a follow up.  She reported that Dr. Sullivant diagnosed Charcot-Marie-Tooth disease.  Dr. White described this disease as "a polyneuropathy that ultimately can lead to weakness, joint destruction, and increasing disability due to the polyneuropathy."  R. 1256.  Fryrear was feeling the same with no new or worsening symptoms.  Dr. White suggested seeing a nutritionist, but

Fryrear declined.  Fryrear reported that she would start some regular activity.  R. 1257.

On May 22, 2016, a medical expert secured by the ALJ, neurologist Dr. Ronald DeVere, M.D., reviewed Fryrear's records submitted to the Social Security Administration and completed a "Medical Interrogatory Physical Impairment(s)—Adults" form and a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form.  R. 1238-48.  Dr. DeVere opined that the records provided enough information to form opinions on nature and severity of Fryrear's impairments.   Dr. DeVere identified carpal tunnel syndrome status post-surgery and Chiari malformation status-post decompression surgery with "improved walking etc."  Dr. DeVere opined that Fryrear's subsequent examinations for numbness and weakness were confusing.  R. 1238-41.

Dr. DeVere opined on whether Fryrear's impairments or combination of impairments met or equaled a Social Security Administration "Listing."  A "Listing" is an impairment that the Social Security Administration has determined is so severe that a person who has such an impairment is disabled without regard to the person's age, education, or work experience, provided that the person is not engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d).  These impairments are listed in the

regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1, and each such impairment is referred to as a Listing.  Dr. DeVere opined that Fryrear's impairments did not meet or equal any Listing.  R. 1241.

Dr. DeVere opined that Fryrear could lift 20 pounds occasionally and 10 pounds frequently; sit two hours at a time for a total of six hours in an eight-hour day; stand and walk for 30 minutes at a time for a total of two hours in an eight-hour workday; walk without a cane; frequently reach, handle, and finger bilaterally; occasionally feel with hands bilaterally; occasionally operate foot pedals, climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; never climb ladders or scaffolds; never work at unprotected heights; never work with moving mechanical parts of machines; occasionally drive; occasionally work in conditions that involved humidity, wetness, dust, odors, fumes and pulmonary irritants, extreme cold, vibrations, and moderate office noise; and never work in conditions that involved extreme heat.  R. 1243-47.

On June 1, 2016, Fryrear saw Dr. Donna White for a medication check and refills.  R. 1249-54.  Fryrear reported that she was doing okay, with some better days and some worse.  She was concerned about an upcoming surgery for her daughter.  She was worried about staying awake driving to and from her home in Loraine, Illinois and the hospital in

Springfield, Illinois.  Dr. White suggested short-term, fast acting stimulant in addition to her extended release Adderall.  Fryrear also reported numbness and tingling.  She said that she took some hydrocodone due to a pain flare up.  She said that she did not exercise much.  R. 1250.  Dr. White suggested using the fast-acting stimulant to take in addition to her extended release Adderall to address her driving concerns.  Dr. White renewed her medications.  R. 1249, 1253.

On June 20, 2016, Fryrear saw Dr. Sullivant complaining of left hip and right knee pain.  Fryrear ambulated independently.  Dr. Sullivant scheduled an EMG/nerve conduction study.  R. 1262, 1267.

On October 13, 2016, Fryrear saw neurologist Dr. Arun Varadhachery, M.D., Ph.D. for a consultation.  R. 1309-11.  Dr. Varadhachery stated that Fryrear had a history of long standing myalgias and unverified narcolepsy.  On examination, Fryrear had full strength in her upper and lower extremities with normal muscle bulk.  Her reflexes were 2+ in biceps, knees, and ankles.  Her finger-nose-finger testing was normal.  Her gait and stance were normal.  Fryrear could stand on her heels and her toes.  She had some temperature and pinprick sensations abnormalities.  R. 1310.  Dr. Varadhachery concluded in his letter to Fryrear's doctors:

> Impression: Terrie Fryrear is a 32-year-old woman with a variety of symptoms.  She has no single chief complaint.  From

the neuromuscular perspective, the complaint of myalgias along with temperature and pinprick temperature sensation abnormalities are suggestive of a small fiber peripheral neuropathy.   She has no weakness or evidence of large caliber nerve dysfunction to suggest a hereditary neuropathy or myopathy.  Her neuromuscular function is good, discounting the pain issues.  An Ehlers-Danlos variant may be a way to unify her small fiber neuropathy symptoms and the hyperextensible joint complaint.

Separately, she describes sleep spells/attacks along with collapsing in association with strong emotions.  This description certainly could fit criteria for narcolepsy with cataplexy.  I don't have any records of a sleep latency study that would otherwise confirm the sleep disorder diagnosis.  It doesn't appear that her sleep disorder is directly related to the small fiber neuropathy complaint.

At this point I have no specific recommendations for further workup.  Given her benign exam, I don't think an extensive [neuromuscular] work up would add substantively to her care. Focusing on symptomatic management with a combination of pharmacologic, physical and cognitive behavioral therapies seems to be the best pathway forward for her. I have asked her to seek your counsel on local resources.

Thank you for allowing us to consult on this case. If there is some issue that I have not been able to adequately address, please do not hesitate to contact me.

R. 1310-11.[2]

On November 23, 2016, Fryrear saw Dr. White.   R. 1300-03.  Fryrear

said she had not had any recent flare ups.  She said that the compression

---

[2] Ehlers-Danlos syndrome is a group of inherited disorders of the connective tissue varying widely in severity.  See Dorland's Illustrated Medical Dictionary (2012 32nd ed.), at 1828-29.

hose worked well.  She still had narcolepsy symptoms.  She had moments during the day when she went to sleep suddenly.  She could usually tell when the sudden sleepiness would come on her.  She said her symptoms were better with the Adderall, but not gone.  R.1300.  On examination, Fryrear had a normal gait with no involuntary movements.  She had full range of motion in her extremities.  Her neurological examination was normal.  Dr. White renewed her medications, including a short acting stimulant for use as needed along with extended release Adderall.  R. 1303.

On February 8, 2017, Fryrear saw Dr. White for a follow up.  R. 1296-98.  Fryrear reported that the short acting Adderall worked well for driving from her home in Loraine, Illinois to Springfield, Illinois.  She said she used prednisone for a pain flare up a few weeks earlier and the medicine worked well.  R. 1296.  On examination,  her gait was normal with no involuntary movements.  Dr. White observed diminished sensation to light touch on both legs and diminished sensation to monofilament wire testing on both feet.  Dr. White renewed the prescription for Adderall and recommended continued exercise and healthy eating.  Dr. White noted Fryrear had lost seven to 10 pounds.  R. 1297.

On March 23, 2017, Fryrear saw Dr. Sullivant for carpal tunnel syndrome and muscle weakness. R. 1325-32. Fryrear also complained of narcolepsy. Fryrear reported that she was doing the same as her last visit. Fryrear reported that Dr. Varadhachery diagnosed Ehlers-Danlos syndrome. Dr. Sullivant said that Dr. Varadhachery's notes were sent to Fryrear's primary care physician but could not be found at this time. Dr. Sullivant did not have records from Dr. Varadhachery. Dr. Sullivant said he would await those results. R. 1326. Fryrear reported engaging in aerobic exercise five times a week, as well as flexibility exercises. R. 1328.

On May 10, 2017, Fryrear saw Dr. White. Fryrear reported that she was doing pretty well, her pain was controlled. She said her legs were doing okay with the compression socks. She said Dr. Sullivant started her on protriptyline which was helping with her pain better than anything else at that time. R. 1320. Dr. White renewed her medications. R. 1321.

On September 28, 2017, Fryrear saw Dr. Sullivant. R. 1349-58. Dr. Sullivant discussed adjusting her medications. He also discussed the benefits of aerobic exercise. R. 1350. Fryrear again reported engaging in aerobic exercise five days a week, along with flexibility exercise. R. 1352. On examination, Fryrear ambulated independently. Dr. Sullivant changed Fryrear's medication due to side effects from the protriptyline. R. 1354.

On October 31, 2017, Dr. White wrote a letter to Fryrear's attorney. R. 1359-60.  Dr. White summarized Dr. Varadhachery's conclusions.  Dr. White stated, "It was from this [Dr. Varadhachery's] letter and from Ms. Fryrear's verbal reports of her conversation with this specialist that we came to the diagnosis of Ehlers-Danlos syndrome, potentially vascular type.  R. 1359.

<u>The Evidentiary Hearings on Remand</u>

On remand, the Administrative Law Judge (ALJ) held hearings on November 9, 2016 and September 25, 2017.[3]

At the November 9, 2016 hearing, Fryrear appeared in person and with her attorney.  R. 772.   At the request of Fryrear's counsel, the ALJ agreed to postpone the testimony of medical expert Dr. DeVere to a later hearing to give counsel more time to review Dr. DeVere's credentials and his May 22, 2016 opinions.  R. 783-87.[4]

Fryrear testified at this hearing.  She lived with her husband and two children ages 11 and 12.  She had a driver's license and drove once a month to the gas station or the post office.  The gas station and post office

---

[3] The ALJ who held these hearings did not hear the original case before the District Court remanded the matter.

[4] Vocational expert Jeffrey Magrowski also testified at the hearing.  R. 821-32.  The Court does not discuss this testimony because the ALJ relied on the testimony of vocational expert Bob Hammond given at the September 25, 2017, supplemental hearing.

were each a block from her home.  She last worked outside the home at a factory making boat anchors.  The job ended when the factory left town.  She has not worked since.  She took some college courses but quit because she could not get rides to classes.  She testified that her husband worked at Kohl's at one time, not her.  She said the confusion on this issue arose because she and her husband had the same first names and last names.  R. 793-96, 814.

Fryrear said that her carpal tunnel release surgery relieved her shoulder stress and pain at night but did not help with the problems she had dropping, grasping, and picking up objects, and did not help with circulation problems.  She dropped items such as cups and soda cans.  She said that she could not feel heat with her hands.  R. 797, 807-08.

Fryrear said she still had neuropathy in her feet.  She had burning and tingling in her feet.  She said that the condition was getting worse and she was falling.  She wore compression hose and work lidocaine patches, but the problem persisted.  She said that she wore ankle braces so that her feet did not "roll out from underneath me."  She said that she always wore her ankle braces.  R. 808-09.

Fryrear said that her feet and lower legs swelled every day.  She said that she had to elevate her feet above her heart every day for an hour

during one of her naps.  She said she had constant pain in her lower extremities.  R. 810.

Fryrear said her problems sleeping in the daytime became extreme after she had children.  She said the insurance company would not pay for an additional sleep latency study after the one done in 2007.  She said she took regular naps at 10:00 a.m. for an hour and a half and at 2:00 p.m. for an hour.  She said that the naps helped.  She also took medication.  She said that the medication helped.  She said that if she got up in the middle of the night to go to the bathroom, she would often fall asleep sitting on the toilet.  She also said she has fallen asleep in the shower.  She also fell asleep watching television.  She said that she did not have such problems during the day because her day was so regimented.  She said the sleep problem was under control during the day with naps and medication.  R. 799-801, 816-17.  Fryrear said that three to four times a month she still fell asleep during the day even with the naps and medication.  R. 801-02.  She said that Dr. Sullivant told her to take naps.  She said that she no longer fell asleep standing up.  R. 806.  She also said that she did not fall asleep driving. She took extra Adderall right before she drives.  R. 814-15.

Fryrear said she could take care of her children, in part, because both children went to school year-round.  The children went to school year-round

because both were autistic. Both started school at the age of 3. Fryrear said that her husband came home from work at 3:00 p.m. and was home when the children returned from school on the school bus at 3:30 p.m. R. 800-01.

Fryrear testified that Dr. Sullivant diagnosed her with Charcot-Maria-Tooth disease. She said that a doctor in St. Louis said she had Ehlers Danlos syndrome. She said she could suck blood through her skin without cutting her skin. R. 811-12.

Fryrear testified that since her last hearing she began having problems with her hips. She said that the hips locked up. She had pain on her right side from this condition. She used ointments, lidocaine patches, compression hose, and heating pads to reduce the pain. She said that she used a heating pad once a day. She said Dr. White prescribed the lidocaine patches. R. 812-13.

Fryrear said that she could comfortably sit for about 30 minutes, stand for seven minutes, and walk for about 15 minutes. R. 815. She said, "It seems to be if I move the pain starts, if I sit, then the sleeping starts, and they play on each other." R. 818. Fryrear's testimony then concluded at the November 6, 2016 hearing.

The ALJ held a second hearing on September 25, 2017.  The ALJ held the hearing in Columbia, Missouri.  Fryrear appeared by her attorney.  She did not appear personally because her husband could not drive her to the hearing.  Her husband had been called to jury duty in federal court in Springfield, Illinois.  R. 706-07.  Dr. DeVere and vocational expert Bob Hammond also appeared by telephone.  R. 708-10.

Dr. DeVere testified first.  The ALJ asked why he opined in his May 22, 2016 opinions that Fryrear could lift 10 pounds frequently and 20 pounds occasionally but did not opine on the amount of weight she could carry.  Dr. DeVere stated that he probably missed that portion of the form.  He opined that she could carry the same weights frequently and occasionally.  R. 713.

Dr. DeVere said Fryrear had medically determinable impairments of a Chari malformation and carpal tunnel syndrome, both of which have been treated surgically.  Dr. DeVere said that narcolepsy was a medically determinable impairment, but it was not a functional impairment because it was treatable.  R. 714-15, 723-24.

Dr. DeVere said that Fryrear did not have medically determinable impairments of Charcot-Marie-Tooth disease and Ehlers-Danlos syndrome because the record contained no objective testing to establish those

diagnoses.  R. 718.  Dr. DeVere stated that a skin biopsy was necessary to confirm small-fiber neuropathy, which was a necessary element to establish Ehlers-Danlos syndrome.  R. 724.  Dr. DeVere reiterated his opinion that none of Fryrear's conditions met or equaled a Listing.  R. 724-25.

Dr. DeVere confirmed his May 22, 2016 opinions on Fryrear's functional limitations except that he opined that Fryrear had no restriction on sitting, standing, or walking based on her symptoms.  R. 725.  Dr. DeVere further stated that climbing stairs would be fine with a handrail.  R. 726.  Dr. DeVere testified that he modified his opinion because, "I have had an opportunity to read more records over the last year and a half, and there's a lot of medicines on board, but not a lot of diagnostic changes that have been done."  R. 728.  He said that the records show that Fryrear's condition improved over the last year and a half due to her Chari malformation surgery and her carpal tunnel surgery.  R. 731-35.

Dr. DeVere stated that Dr. Varadhachery did not establish that Fryrear had  Ehlers-Danlos syndrome.  R. 736.  Dr. DeVere said that confirmation would require an EMG study of her lower extremities, and, if that test was negative, a biopsy to determine whether she had small fiber

neuropathy. He said that without these tests, the diagnosis was not shown by objective testing. R. 737-38, 750.

Dr. DeVere testified that he was an expert in small fiber neuropathy, but not Ehlers-Danlos syndrome. R. 740. Dr. DeVere said he was not familiar with specific symptoms of a vascular type of Ehlers-Danlos syndrome. R. 747.

Dr. DeVere also testified that the functional limitations to which he opined were based on Fryrear's Chari malformation and her carpal tunnel syndrome, both status post-surgery. He testified that Fryrear's balance and coordination improved "tremendously" after her Chari malformation surgery. R. 753-54.

Vocational expert Hammond then testified. The ALJ asked Hammond the following hypothetical question:

> If you assume a hypothetical individual with those past jobs, same age as the claimant -- she is 33 now. And, same education, 12th grade, and assume the individual could perform work at the -- say light exertional level, but standing/walking is two hours out of an eight-hour workday. I'm sorry, I'm having trouble finding my -- here they are. Okay. No more than 30 minutes at a time, and that's the only difference from the light exertional level. The standing/walking is two hours out of an eight-hour workday, no more than 30 minutes at a time. Occasional bilateral feeling, frequent bilateral reaching, handling, fingering, occasional bilateral operation of foot controls. And, the hypothetical individual could perform work that does not require climbing on ropes, ladders or scaffolds, and no more than occasional climbing on ramps and stairs,

stooping, kneeling, crouching or crawling.  Person should avoid all exposure to extreme heat and work hazards such as unprotected heights and being around dangerous moving machinery.

R. 756.  The ALJ asked if such a person could perform Fryrear's past relevant work.  Hammond opined that the person could not.  Hammond opined that such a person could perform the representative jobs of sedentary jobs of laminator, with 100,000 such jobs in the national economy; electric press operator with 115,000 such jobs in the national economy; and circuit board screener, with 105,000 such jobs in the national economy.  Hammond said the person could perform these jobs even if she had to change positions from sitting to standing every 30 to 60 minutes.  R. 757-58.  He said that the person described in the hypothetical question could also perform the representative jobs if she could only understand, remember and carry out simple instructions consistent with unskilled work.  R. 758.

Hammond opined that if the person was limited to carrying ten pounds both frequently and occasionally, then the person could still perform the circuit board screener job, but not the others he identified.  He opined that if the person was limited to standing and/or walking to two hours in an eight-hour workday, the person could still perform all the representative jobs he identified.  R. 760-61.

Hammond opined that the person could not work if she had to take one-hour breaks in the morning and afternoon. The person could not work if she had to elevate her feet above her heart during the workday other than on scheduled breaks and lunchtimes. The person could not work if she fell asleep at work on the job. R. 758-59, 761-62. Hammond said that a person could be off task up to 10 percent of the time during worktime and keep the representative jobs. R. 764. The ALJ ended the hearing after Hammond's testimony.

## THE DECISION OF THE ALJ

The ALJ issued her decision on March 19, 2018. R. 681-95. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of a Listing

specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ also noted that Fryrear met insured status for DIB through June 30, 2005 (Date Last Insured). She, therefore, had to show that she was disabled before June 30, 2005, to receive DIB. See 42 U.S.C. § 423;

Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011). She could be disabled for purposes of SSI if she was disabled on or after the date that she filed her applications on June 22, 2010. R. 684. See R. 867; 20 C.F.R. § 416.335; Perkins v. Chater, 107 F.3d 1290, 1295 (7th Cir. 1997).

The ALJ found that Fryrear met her burden at Steps 1 and 2. She had not engaged in substantial gainful activity since the date she alleged that she became disabled May 1, 2005, and she had severe impairments of bilateral carpal tunnel syndrome with bilateral release surgery in 2006 (right wrist) and 2012 (left wrist); Chiari malformation with history of surgery; narcolepsy, and Ehlers Danlos syndrome by report. R. 684. The ALJ found that Fryrear did not establish that she had a medically determinable impairment due to small fiber neuropathy. The ALJ relied on Dr. DeVere's opinion that a biopsy was necessary to confirm such a diagnosis. R. 684.

The ALJ held at Step 3 that Fryrear's impairments or combination of impairments did not meet or equal any Listing. The ALJ relied on Dr. DeVere's opinions and the fact that no medical source opined that her impairments met or equaled a Listing. R. 687. The ALJ specifically considered whether Fryrear's narcolepsy impairment met Listing 11.02 for convulsive epilepsy. The ALJ concluded that Fryrear's narcolepsy did not meet or equal Listing 11.02 or any other listed impairments. R. 686.

At Step 4, the ALJ found that Fryrear had the following RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional lifting up to 20 pounds and the frequent lifting/carrying up to 10 pounds; standing or walking 2 hours out of an 8-hour workday no more than 30 minutes at a time, and sitting 6 hours out of an 8-hour workday. The claimant requires a sit/stand option allowing change in position every 30 to 60 minutes for a few minutes at a time while remaining at the workstation (with no loss in production). She is limited to occasional bilateral feeling; frequent bilateral reaching, handling, and fingering; and occasional bilateral operation of foot controls. The claimant could perform work that does not require climbing on ropes, ladders or scaffolds and no more than occasional climbing on ramps/stairs, stooping, kneeling, crouching or crawling, and should avoid all exposure to extreme heat and work hazards such as unprotected heights and being around dangerous moving machinery. The claimant is able to understand, remember and carry out simple instructions consistent with unskilled work.

R. 687.

The ALJ relied on the evidence in the record that her bilateral carpal tunnel surgeries and her Chiari malformation surgery relieved many of her symptoms that limited her functional abilities.  R. 688, see Fryrear I Opinion, at 5-10, 18, R. 870-75, R. 883, for a discussion of these surgeries. The ALJ also relied on the reports by Drs. White and Sullivant since 2011 that showed near normal or normal strength, grip strength, and range of motion, as well as the ability to walk without assistive devices.  The ALJ additionally relied on the Plaintiff's reports to Dr. Sullivant that she rode a

stationary bicycle 30 minutes a day.  The ALJ relied on medical evidence that the combination of extended release Adderall and short acting stimulants effectively treated her narcolepsy.  R. 689-90.  The ALJ indicated reliance on the opinions of Drs. DeVere, Bilinsky, and Pilapil, and the post-surgery treatment notes of Dr. Reynolds' nurse practitioner Anita Arnold, CNP, to support her RFC determination.  R. 691-92;  see Fryrear I Opinion, at 9-10, 12-14, 16-17, R. 874-75, R. 877-78, R. 881-82, for a discussion of the opinions of Drs. Bilinsky and Pilapil, and the treatment notes of nurse practitioner Arnold.

The ALJ found Dr. White's opinions from 2011 and her opinions from January 2013 less persuasive because they were inconsistent with the other opinion evidence and inconsistent with reports that showed normal strength and gait.  The ALJ, however, adopted Dr. White's opinions regarding environmental limitations, balancing limitations, and limitations in handling, fingering, and feeling with her hands.  The ALJ found these opinions consistent with the evidence in the record.  R. 692-93.

The ALJ found that Fryrear's statements about the severity of her symptoms were not consistent with the rest of the evidence in the record. The ALJ cited to evidence that her surgeries and her medication for narcolepsy significantly improved her functional capabilities.  The ALJ

relied on the medical record that showed significant improvement after her surgeries.  The ALJ relied on medical records showing normal to near normal strength and range of motion, and the ability to walk without a cane.  The ALJ also relied on medical records that showed that her Adderall and other medications effectively treated her sleeping symptoms.  The ALJ additionally relied on her statements to Dr. Sullivant that she rode a stationary bicycle every day for 30 minutes.  The ALJ found that her daily activities which included taking total care of her children, one of whom is autistic, were quite demanding and not limited to the extent one would expect given the complaints of Fryrear.  R. 688-91.

After determining Fryrear's RFC, the ALJ found at Step 4 that she could not perform her prior relevant work.  At Step 5, the ALJ found that Fryrear could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinion of vocational expert Hammond that a person with Fryrear's age, education, work experience, and RFC could perform the representative jobs of laminator I, electrical press operator, and circuit board screener.  The ALJ concluded that Fryrear was not disabled.  R. 694-695.

Fryrear then filed this action for judicial review. The decision of the ALJ then became the final decision of the Commissioner. 20 C.F.R. §§ 404.984(d); 416.1584(d) (appeal procedures in cases remanded by federal courts).

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least

minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The decision is supported by the opinions of Drs. DeVere, Bilinsky, and Pilapil, as well as the medical reports that showed significant improvement after Fryrear's surgeries.  The decision is also supported by the medical reports of office visits with Dr. White and Sullivant that showed that the Adderall was effective in controlling her daytime sleepiness, her compression stockings and lidocaine patches controlled her problems with her legs, and her other medications were effective in controlling her pain.  The findings were also supported by her reports to Dr. Sullivant that she rode a stationary bicycle every day for 30 minutes.  All these pieces of evidence provided substantial evidence to support the ALJ's determination of Fryrear's RFC.  The RFC determination and the testimony of vocational expert Hammond supported the ALJ's determination at Step 5 that Fryrear could perform a significant number of jobs in the national economy.  The decision was supported by substantial evidence.

Fryrear argues that the ALJ erred in not finding that she had a medically determinable impairment of Ehlers-Danlos syndrome. The Court finds no error. The ALJ found that an Ehlers-Danlos variant was mentioned as a diagnosis which "may be a way" to verify symptoms in a report from Dr. Varadhachery. R. 684. The ALJ, however, relied on Dr. DeVere's opinions. Dr. DeVere opined that small fiber neuropathy was a necessary element of Ehlers-Danlos syndrome and that Ehlers-Danlos syndrome could not be established except by a skin biopsy to confirm small fiber neuropathy. See R. 737-38, 750. Based on this opinion, the ALJ found that Fryrear did not have a medically determinable impairment of small fiber neuropathy as there was no evidence of a skin biopsy confirming small fiber neuropathy. R. 684.

The ALJ's finding of no medically determinable impairment of small fiber neuropathy was supported by substantial evidence. A medically determinable impairment must be shown by objective medical signs and laboratory findings established by medically acceptable clinical or laboratory diagnostic techniques. 20 C.F.R. § 404.1529(b). No doctor stated that such medical signs or laboratory findings established that Fryrear had Ehlers-Danlos syndrome. Dr. Varadhachery only opined that Ehlers-Danlos syndrome "may" explain her symptoms. Dr. Varadhachery

also said that her examination was so benign that further testing was not warranted.  Dr. Varadhachery did not confirm this diagnosis.  Dr. Sullivant never saw Dr. Varadhachery's records and did not conduct any tests to determine whether Fryrear had Ehlers-Danlos syndrome.  Dr. White said in her October 31, 2017 letter that she relied exclusively on Dr. Varadhachery's notes and Fryrear's statements of symptoms as a basis of her Ehlers-Danlos syndrome.  None of these doctors conducted any objective tests or other recognized techniques to confirm this diagnosis. Dr. DeVere opined that a biopsy was necessary to establish whether Fryrear had small-fiber neuropathy, a necessary element of Ehlers-Danlos syndrome.  Based on these records, the ALJ had substantial evidence to find that Fryrear did not establish at Step 2 that she had a medically determinable impairment of small fiber neuropathy.

Fryrear argues that the ALJ erred in not finding that her narcolepsy prevented her from working.[5]  The Court again disagrees.  The evidence from the office visits with Drs. White and Sullivant could support the inference that the extended release Adderall combined with fast acting

---

[5] Fryrear argues that the ALJ erred by failing to consider properly whether her narcolepsy met a Listing. The ALJ said that her impairment did not meet the Listing 11.02 for convulsive epilepsy.  Fryrear argues that the ALJ should have considered whether Fryrear met Listing 11.03 for non-convulsive epilepsy. Fryrear Brief, at 20.  The Court cannot follow Fryrear's argument.  Listing 11.02 is for epilepsy, not convulsive epilepsy, and Listing 11.03 is reserved.  20 C.F.R. Pat 404, Subpart P, Appendix 1, §§ 11.02, 1103.  Furthermore, Fryrear fails to identify any evidence that supports a finding that her condition meets any Listing.

short-term stimulants were effective in controlling her symptoms. Fryrear also testified that she no longer fell asleep standing up and she did not fall asleep driving. In addition, Dr. DeVere testified that narcolepsy was treatable and not a functional impairment. The ALJ had substantial evidence to support her conclusion regarding her narcolepsy symptoms.

Fryrear argues that the ALJ erred in not finding that Fryrear's carpal tunnel syndrome affected her ability to function in the workplace. The ALJ, however, found that Fryrear's carpal tunnel syndrome affected her functional ability to work. The ALJ limited Fryrear's RFC to no more than occasional feeling and no more than frequent fingering and handling. These limitations reflected Fryrear's residual limitations from her carpal tunnel syndrome after her bilateral carpal tunnel release surgery. The findings were supported by the opinion of Dr. DeVere and the treatment notes of Fryrear's orthopedic surgeon, Dr. George Crickard, M.D. See Fryrear I Opinion, at 3-5, 17-18, R. 867-70, R. 882-83. The ALJ's consideration of Fryrear's carpal tunnel syndrome was supported by substantial evidence.

Fryrear also argues that the ALJ erred in not giving controlling weight to Dr. White's opinions. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective

evidence and are not inconsistent with other evidence in the record. 20

C.F.R. § 404.1527(d)(2); <u>Bauer v. Astrue</u>, 532 F.3d 606, 608 (7th Cir.

2008).[6]

The Court finds no error in the ALJ's treatment of Dr. White's

opinions. On August 18, 2011 Dr. White opined that Fryrear was limited to

lifting less than 10 pounds and limited to less than two hours of standing

and/or walking in an eight-hour workday. Dr. White also opined that

Fryrear was limited to frequent handling and fingering but could feel

constantly. R. 522-23; <u>see</u> <u>Fryrear I Opinion</u>, at 15-16, R. 880-81. The ALJ

gave little weight to Dr. White's limitations on lifting, walking, and standing;

but she gave great weight to Dr. White's opinions on Fryrear's ability to

finger, handle, and feel. Dr. White's opinions on lifting, walking and

standing were inconsistent with numerous office examinations that showed

normal or near normal strength and mobility, normal gait, and the ability to

walk without an assistive device. Dr. White's opinions were also

inconsistent with the opinions of Drs. Bilinsky, Pilapil, and DeVere. The

---

[6] The Commissioner recently changed the regulations regarding the interpretations of medical evidence. The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. <u>Revisions to Rule Regarding the Evaluation of Medical Evidence</u>, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017). As such, the amendments do not apply here.

ALJ had an ample basis in the evidence to conclude that these opinions of Dr. White were not entitled to controlling weight.

Dr. White also opined in 2013 that Fryrear was disabled by an underlying autoimmune rheumatologic issue. The ALJ did not give this finding controlling weight because Dr. White's opinions were not supported by the evidence in the record. The ALJ cited numerous findings in the medical records that compression stockings, lidocaine patches, and pain medications controlled her symptoms and she had a steady normal gait and could walk without assistive devices. R. 692-93. In light of the contrary evidence cited by the ALJ, the decision to give Dr. White's 2013 opinion controlling weight was supported by substantial evidence and was not error.

Fryrear argues last that the ALJ erred in determining Fryrear's RFC. The Court again disagrees. For the reasons set forth above, the ALJ had ample evidence to support her RFC finding. Fryrear essentially wants this Court to reweigh the evidence. The Court cannot and will not do so. See e.g., Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82. The decision was supported by substantial evidence.

THEREFORE, IT IS ORDERED that the Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 20) is ALLOWED, the Plaintiff Terrie Fryrear's Brief in Support of Motion for Summary Judgment (d/e 17) is DENIED, and the decision of the Commissioner is AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS CLOSED.

ENTER:   October 24, 2019


<u>        s/ *Tom Schanzle-Haskins*        </u>
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE